UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
LOUISVILLE DIVISION

STEVEN STAUB,                                                          Plaintiff,

v.                                                    Civil Action No. 3:15-cv-689-DJH-RSE

TRACY NIETZEL et al.,                                                Defendants.

* * * * *

**<u>MEMORANDUM OPINION AND ORDER</u>**

Plaintiff Steven Staub, a former Kentucky Department of Corrections (KDOC) inmate, brought this 42 U.S.C. § 1983 action against several state prison officials, claiming that the defendants violated his right to due process under the Fourteenth Amendment when they punished him for possessing dangerous contraband following a prison disciplinary hearing that the Kentucky Court of Appeals later found to be constitutionally inadequate.  (*See* Docket No. 1)  Staub also asserted negligence-per-se claims against the defendants and alleged that they engaged in a civil conspiracy, committed gross negligence, and negligently failed to adequately train prison officials with regard to inmates' due process rights.  (*Id.*)  Seven of the defendants now move for summary judgment on all of Staub's claims against them (D.N. 76), and Staub cross-moves for partial summary judgment on the issue of whether the prior decision by the Kentucky Court of Appeals precludes relitigation of the defendants' liability as to Staub's due process claims (D.N. 77).  For the reasons explained below, the Court will deny Staub's motion and grant the defendants' motion.

## I.

The following facts come from the parties' respective summary-judgment motions and their "cit[ations] to particular parts of materials in the record." Fed. R. Civ. P. 56(c)(1)(A).[1]

## A.

On December 19, 2012, prison officials at Kentucky's Northpoint Training Center (NTC), where Staub was serving a state prison sentence, searched Staub's living quarters and found what appeared to be eleven Suboxone strips wrapped in cellophane.[2]  (D.N. 76-1, PageID # 386–87; D.N. 76-2, PageID # 417; D.N. 77-1, PageID # 499)  Marcus Faulkner, a Training Instructor at NTC, completed a disciplinary report the next day describing the search.  (D.N. 76-1, PageID # 389; D.N. 77-1, PageID # 499–500)  Faulkner wrote in his report that he "found a total of 11 Suboxone strips in [inmate] Staub's locker" and noted that after the search, "a chain of custody was completed"; "[p]ictures were taken of the [S]uboxone strips"; and the "strips were turned over to" Captain Jonathan Beasley "to be placed in the evidence locker."  (D.N. 76-5, PageID # 430) After receiving the seized strips from Faulkner, Beasley attests, he completed a separate

---

[1] In accordance with Federal Rule of Civil Procedure 56, the defendants support their factual assertions with citations to various "documents," "affidavits," and "other materials" that are attached to their summary-judgment motion (D.N. 76-1).  *See* Fed. R. Civ. P. 56(c)(1)(A).  Staub's factual assertions, however, are derived almost exclusively from the Kentucky Court of Appeals' recitation of facts in a decision issued on May 22, 2015, *see Staub v. Taylor*, No. 2014-CA-1452, 2015 WL 2445103, at *1–3 (Ky. Ct. App. May 22, 2015).  (*See* D.N. 77-1, PageID # 499; D.N. 79, PageID # 579–80)

[2] Suboxone is a "prescription medicine used to treat opioid addiction in adults." *Medication Guide: Suboxone Sublingual Film*, INDIVIOR (March 2021), https://www.suboxone.com/pdfs/medication-guide.pdf.  It comes in the form of a "film" or strip that patients place on the inside of their cheek or under their tongue. *Id.*  Suboxone contains buprenorphine, *id.*, which is a comparatively mild opioid that has been approved by the FDA to treat opioid use disorder. *Buprenorphine*, SUBSTANCE ABUSE & MENTAL HEALTH SERVS. ADMIN. (Jan. 24, 2022), https://www.samhsa.gov/medication-assisted-treatment/medications-counseling-related-conditions/buprenorphine.  "Because of buprenorphine's opioid effects," however, it can still "be misused, particularly by people who do not have an opioid dependency." *Id.*

Extraordinary Occurrence Report, which included a photocopy of a chain-of-custody form. (D.N. 76-1, PageID # 387–88; D.N. 76-6, PageID # 435–36; *see* D.N. 76-8)  That photocopied version of the form showed three separate entries on December 19, 2012: one documenting Faulkner's seizure of the suspected Suboxone strips from Staub's locker; one marking the transfer of those strips from Faulkner to Beasley; and one confirming Beasley's placement of the strips in the evidence locker.  (D.N. 76-1, PageID # 387; D.N. 76-8, PageID # 443)  The chain-of-custody form attached to Beasley's report did not include an "Evidence Log" number, however, and it indicated that the Suboxone strips had been obtained from "Bed 48," which apparently did not belong to Staub.  (D.N. 76-2, PageID # 420; D.N. 76-8, PageID # 443; D.N. 77-1, PageID # 500)

Following the search of his living quarters, Staub was charged as part of a prison disciplinary proceeding with "[p]ossession or promoting of dangerous contraband," to which he pleaded not guilty.  (D.N. 76-1, PageID # 389; D.N. 77-1, PageID # 500; *see* D.N. 76-5, PageID # 430–31)  A disciplinary hearing was held at NTC on January 10, 2013.  (D.N. 76-1, PageID # 389; D.N. 77-1, PageID # 500)  The defendants concede that the chain-of-custody form that was reviewed during that hearing was the version that Beasley had attached to his December 19, 2012 Extraordinary Occurrence Report, which showed Beasley as the last person to handle the seized Suboxone strips.  (D.N. 76-1, PageID # 413; D.N. 76-8, PageID # 443; *see* D.N. 76-1, PageID # 387, 402–03; D.N. 76-3, PageID # 424–26; D.N. 76-6, PageID # 435; D.N. 76-17, PageID # 485)  Accordingly, Staub argued at the hearing that "there [wa]s nothing showing" that the strips seized in his living quarters had been "tested by a lab," and he also pointed out that "there [wa]s no evidence tag number" assigned to the strips.  (D.N. 76-5, PageID # 432; *see* D.N. 76-1, PageID # 389; D.N. 77-1, PageID # 500)  The presiding adjustment officer nonetheless found Staub guilty "based on the fact that . . . Faulkner found a total of 11 [S]uboxone strips in [inmate] Staub's

3

locker" and penalized Staub with a ninety-day placement in disciplinary segregation and the forfeiture of 180 days of good-time credit. (D.N. 76-5, PageID # 432–33; *see* D.N. 76-1, PageID # 389; D.N. 77-1, PageID # 500–01)

Staub appealed the adjustment officer's decision to NTC's warden, who ultimately ordered that Staub's case be reheard. (D.N. 76-1, PageID # 389; D.N. 77-1, PageID # 501) A second disciplinary hearing was thus scheduled to take place at the Kentucky State Reformatory (KSR), where Staub had since been transferred. (D.N. 76-1, PageID # 390; D.N. 77-1, PageID # 501) Faulkner prepared a new disciplinary report on February 15, 2013, which again described his seizure roughly two months earlier of what appeared to be eleven Suboxone strips in Staub's living quarters at NTC.[3] (D.N. 76-1, PageID # 390; D.N. 76-2, PageID # 418–19; D.N. 77-1, PageID # 501; *see* D.N. 76-13) Lieutenant Michael D. Wilson at KSR was tasked with investigating this new report. (D.N. 76-1, PageID # 390; D.N. 77-1, PageID # 501–02; *see* D.N. 76-13, PageID # 465–66) And Lieutenant Dawn Deckard, also at KSR, was assigned to serve as the presiding adjustment officer at Staub's second disciplinary hearing. (D.N. 76-1, PageID # 390–91; D.N. 77-1, PageID # 501; *see* D.N. 76-13, PageID # 467–68)

On February 28, 2013, Deckard received an email from Tracy Nietzel, a Lieutenant at NTC, that included "the requested information needed for the rehearing" of Staub's case. (D.N. 76-15, PageID # 473; *see* D.N. 76-1, PageID # 391; D.N. 77-1, PageID # 501) Attached to that email was a completed "MMC Buprenorphine HCL Test" worksheet dated December 19, 2012, which indicated that "33 strips" had tested positive for "Buprenorphine HCL," an opioid and one of

---

[3] Staub argues that Faulkner's February 15, 2013 disciplinary report "included new factual claims differing [from] Faulkner's initial report." (D.N. 77-1, PageID # 501) The defendants acknowledge that "Faulkner's description of the events" in his second disciplinary report "is not a verbatim recitation of the facts as set out in" his first report, but they maintain that "the essential facts are the same" in both reports. (D.N. 76-1, PageID # 390)

Suboxone's main ingredients.  (*See* D.N. 76-15, PageID # 474)  The worksheet listed Staub as the "Subject," Nietzel as the "Examiner," and "550" as the "Evid #," and it was signed by Nietzel and a witness.[4]  (*Id.*; *see* D.N. 76-3, PageID # 423)  Two photographs of a testing vial were also attached to Nietzel's email.  (*See* D.N. 76-15, PageID # 475–76)  And in the email's body, Nietzel stated that she had "also identified the . . . strips to be [b]uprenorphrine [sic], Suboxone through pill identifier just as [she] would when a tablet, capsule, etc. is found."  (*Id.*, PageID # 473)  In short, the email and accompanying worksheet and photographs appeared to indicate that the strips seized in Staub's living quarters on December 19, 2012, had tested positive for buprenorphine and been separately identified as Suboxone strips during field tests that Nietzel conducted that same day.  (*See* D.N. 76-1, PageID # 388, 391; D.N. 76-3, PageID # 423; D.N. 77-1, PageID # 501)  As for the discrepancy between the number of strips tested by Nietzel (thirty-three) and the number found in Staub's living quarters (eleven), Nietzel apparently discovered during her field tests that each of the "strips" seized from Staub was in a fact a cellophane-wrapped packet of three strips. (D.N. 76-1, PageID # 388; D.N. 76-3, PageID # 423; *see* D.N. 1-1, PageID # 32)

On March 1, 2013, Wilson, the officer at KSR investigating Staub's disciplinary report, emailed Nietzel to ask her if "there [wa]s a more up to date Chain of Custody [form]" for the Suboxone strips that had been seized from Staub's living quarters and, as suggested by Nietzel's email to Deckard the day before, later tested by Nietzel for buprenorphine.  (D.N. 76-16, PageID # 478; *see* D.N. 76-1, PageID # 391; D.N. 77-1, PageID # 501–02)  Nietzel emailed Wilson a copy

---

[4] Staub attributes this second signature to "Bart Nyer," who is named as a defendant in Staub's complaint.  (D.N. 1, PageID # 2, 8)  The defendants, on the other hand, assert that "Robert Ruger signed as witness on [Nietzel's] worksheet."  (D.N. 76-1, PageID # 388)  Ruger is not a party to this matter.  (*See* D.N. 1, PageID # 2)

5

of the requested chain-of-custody form ten days later.  (D.N. 76-16, PageID # 477, 479; *see* D.N. 76-1, PageID # 391; D.N. 77-1, PageID # 502)

The parties' primary dispute in this matter concerns the authenticity of this chain-of-custody form.  Staub contends that the chain-of-custody form that Nietzel sent to Wilson on March 11, 2013, was "different from" the chain-of-custody form that "had been reviewed" during his first disciplinary hearing at NTC in January 2013.  (D.N. 77-1, PageID # 502)  The earlier version of the form did not have an "Evidence Log" number, and it only listed three entries, the last of which indicated that Beasley placed the seized Suboxone strips in NTC's evidence locker on December 19, 2012; nowhere did that form suggest that Nietzel ever took possession of the strips at a later time or that the strips were ever tested for buprenorphine.  (D.N. 76-8, PageID # 443; *see* D.N. 1-1, PageID # 7–8; D.N. 77-1, PageID # 502)  Yet Staub points out that the chain-of-custody form that Nietzel emailed to Wilson "included a new [fourth] entry" on December 19, 2012, that ostensibly indicated that Nietzel had retrieved the strips from NTC's evidence locker on that date and moved them to the Internal Affairs office "for testing."  (D.N. 77-1, PageID # 502; *see* D.N. 76-16, PageID # 479)  Nietzel's form also included an "Evidence Log" number that matched the number on the field-test results that Nietzel emailed to Deckard on February 28, 2013.  (*Id.*; D.N. 77-1, PageID # 502; *see* D.N. 76-15, PageID # 474)  According to Staub, these differences between Nietzel's chain-of-custody form and the version reviewed during his first disciplinary hearing betray Nietzel's efforts to "concoct[] an altered 'chain of custody' form" in order to "hav[e] it appear that evidence existed to support a punishment against [Staub]" for possessing contraband "when in fact such evidence did not exist."  (D.N. 77-1, PageID # 519)

The defendants insist, however, that the chain-of-custody form with only three entries was merely an "incomplete photocopy" of the very same chain-of-custody form that Nietzel completed

on December 19, 2012, and later emailed to Wilson in March 2013.  (D.N. 76-1, PageID # 413; *see id.*, PageID # 387–89)  According to the defendants, Nietzel—who was "the officer in charge" of Internal Affairs at NTC and the holder of "the only key to the [facility's] evidence locker"— moved the seized strips and their accompanying chain-of-custody form to the Internal Affairs office on December 19, 2012, in order to "conduct[] the testing" that ultimately confirmed that the strips contained buprenorphine.  (*Id.*, PageID # 388; *see* D.N. 76-3, PageID # 422–23)  The defendants' evidence suggests that Nietzel recorded the positive field-test results on an "MMC Buprenorphine HCL Test" worksheet—the same worksheet that she emailed to Deckard on February 28, 2013—and then added a fourth and final entry to the chain-of-custody form—the same form that she emailed to Wilson on March 11, 2013.  (D.N. 76-1, PageID # 388–89; *see* D.N. 76-15, PageID # 474; D.N. 76-16, PageID # 479)  The defendants admit that Nietzel's completed chain-of-custody form was not included in the record of Staub's first disciplinary hearing.  (D.N. 76-1, PageID # 403, 413; D.N. 76-3, PageID # 424–26)  But they maintain that this "error was then corrected" when Wilson "obtain[ed] a copy of the original and complete chain of custody [form] from Nietzel" via email in preparation for Staub's second disciplinary hearing at KSR.  (D.N. 76-1, PageID # 403; *see* D.N. 76-16)

That hearing was held on March 19, 2013.  (D.N. 76-1, PageID # 391; D.N. 77-1, PageID # 502)  Deckard, the presiding adjustment officer, found Staub guilty again of "[p]ossession or promoting of dangerous contraband."  (D.N. 76-1, PageID # 391; D.N. 77-1, PageID # 502; *see* D.N. 76-13, PageID # 467)  Deckard based her decision "on the fact that" Staub "was searched" on December 19, 2012; that Faulkner had "found" eleven Suboxone strips while searching Staub's property; that Beasley had stated "that he did place" those strips "into the evidence locker"; that Nietzel had stated "that after further investigation[,] it was found that" each of the eleven seized

strips actually "contained 3 strips"; that Nietzel had tested those strips, which "came back positive for Burprenorphine [sic]"; and that Nietzel had stated that "she also identified the Suboxone [through] the pill identifier just as she would with a tablet or capsule." (*Id.*) Staub was again punished with ninety days in disciplinary segregation, which he had already served by that point, and the forfeiture of 180 days of good-time credit. (*Id.*, PageID # 467–68; *see* D.N. 76-1, PageID # 391)

Staub appealed Deckard's decision to KSR's warden, Clark Taylor. (D.N. 76-1, PageID # 391; D.N. 77-1, PageID # 502) Staub challenged the sufficiency of the evidence supporting Deckard's finding of guilt, citing the "inconsistencies" between Nietzel's chain-of-custody form and the one reviewed during Staub's first disciplinary hearing. (*See* D.N. 77-1, PageID # 502) Staub also "challeng[ed] the fact that Officer Deckard heard and decided his case despite the fact she was involved in the gathering of evidence against him." (*Id.*) Taylor denied Staub's appeal on April 18, 2013, explaining that the Suboxone strips "were found in [Staub's] assigned locker"; that it was eventually discovered that "a total of 33 strips" had been seized; that these strips "tested positive and were properly identified"; that "Suboxone strips are very distinctive in shape and color"; and that, in sum, he found this evidence "to be sufficient" to affirm Deckard's finding of guilt. (D.N. 76-13, PageID # 468; *see* D.N. 76-1, PageID # 391–92; D.N. 77-1, PageID # 502)

**B.**

After being found guilty a second time, Staub filed a petition for declaration of rights in Oldham Circuit Court in February 2014, in which he named Taylor and Deckard as defendants in their respective capacities as warden and adjustment officer. (D.N. 76-1, PageID # 392; D.N. 77-1, PageID # 502, 516) In his petition, Staub alleged that his due process rights had been violated during his second disciplinary hearing at KSR. (D.N. 76-1, PageID # 392) The circuit court

dismissed Staub's petition, and Staub appealed to the Kentucky Court of Appeals.  (*Id.*; D.N. 77-1, PageID # 503)

In an opinion issued on May 22, 2015, the Kentucky Court of Appeals reversed the circuit court's dismissal and held that Staub's due process rights had indeed been violated because the "disciplinary action decision" issued by Deckard and affirmed by Taylor "was not supported by at least 'some evidence' of record" as required by United States Supreme Court precedent.  *Staub v. Taylor*, No. 2014-CA-1452, 2015 WL 2445103, at *1 (Ky. Ct. App. May 22, 2015)  More specifically, the Court of Appeals found that Deckard's and Taylor's findings of guilt "were based almost entirely upon the results of Lt. Nietzel's field test on the suspected Suboxone strips" and "her identification" of those strips "through the pill identifier."  *Id.* at *5.  Yet in the court's view, the "new version" of the chain-of-custody form that Nietzel emailed to Wilson in March 2013 was "highly suspect" because it included a "fourth entry [that] was not on" the version of the form that KSR officials had initially received as part of the record of Staub's first disciplinary hearing.  *Id.* The court thus concluded that Nietzel's chain-of-custody form could not "form the basis for" admitting her field-test results as evidence against Staub.  *Id.*  And because "there [wa]s no evidence linking" those field-test results "to the strips found" in Staub's living quarters and "there [wa]s no other evidence in the record to support the imposition of any disciplinary action" against Staub, the Court of Appeals held that "there [wa]s not 'some evidence' in the record to support the finding of guilt" against him  *Id.* at 5–6.

After the Kentucky Court of Appeals issued its decision, the good-time credit that Staub had forfeited was restored, and the disciplinary actions stemming from the December 19, 2012 search at NTC were expunged from his prison record.  (*See* D.N. 31, PageID # 224; D.N. 76-1, PageID # 393)

**C.**

Staub filed this action in August 2015, naming Nietzel, Faulkner, Beasley, Wilson, Deckard, and Taylor as defendants, along with "Bart Nyer," a "'Correctional Officer' at NTC"[5]; LaDonna Thompson, the "'Commissioner' of the Kentucky Department of Corrections"; and J. Michael Brown, the "Secretary of the Kentucky Justice & Public Safety Cabinet." (D.N. 1, PageID # 2)  Thompson and Brown were sued in their official and individual capacities, while the other defendants were sued only in their individual capacities. (*Id.*)

In his complaint, Staub alleged that Nietzel, Nyer, Faulkner, Beasley, Wilson, Deckard, and Taylor violated his right to due process under the Fourteenth Amendment on four occasions: (1) when Faulkner "issued a new disciplinary report" in February 2013 "in contravention of" KDOC procedures; (2) when all seven defendants allegedly "acted in concert to create and pass forged and falsified public records"—namely, a chain-of-custody form—"to ensure a disciplinary conviction" against Staub; (3) when Wilson, Deckard, and Taylor "charged and convicted [Staub] of possessing and promoting of dangerous contraband absent an adequate foundation for admitting test results"; and (4) when Deckard, "after participating in the investigative process" preceding Staub's second disciplinary hearing at KSR, "sat as adjustment officer and convicted [Staub]" at that hearing "in contravention of [Staub's] right to be judged by an impartial decision-maker," a move that was later "ratified" by Taylor. (*Id.*, PageID # 11–12)  Staub also asserted various

---

[5] "Bart Nyer" appears to be the name that Staub mistakenly attributed to the person who signed the "Witness Signature" line on Nietzel's December 19, 2012 buprenorphine field-test worksheet. (*See* D.N. 76-16, PageID # 480)  The defendants claim that Robert Ruger was that witness (D.N. 76-1, PageID # 388), and they notified Staub as early as July 2016 that "[t]he Kentucky Department of Corrections has no record of an employee named Bart Nyer." (D.N. 12, PageID # 69)  Staub never amended his complaint to correct this mistake, however, and the Court will accordingly order him to show cause why Nyer should not be dismissed from this matter. *See* Fed. R. Civ. P. 21.

negligence-per-se claims against these seven defendants and claimed that they engaged in a civil conspiracy and committed gross negligence. (*Id.*, PageID # 12–13) Finally, he alleged that Thompson and Brown negligently failed to "promulgate administrative regulations to provide for the training and continuing training" of prison officials regarding "disciplinary procedures and prisoners' due process rights," which "resulted in . . . systemic due process and procedural violations." (*Id.*, PageID # 13)

Following several years of litigation, Nietzel, Faulkner, Beasley, Wilson, Taylor, Thompson, and Brown now move for summary judgment on all of Staub's claims against them.[6] (D.N. 76) Staub in turn cross-moves for partial summary judgment "on the issue of liability," arguing that relitigating whether the defendants violated his due process rights is precluded by the Kentucky Court of Appeals' May 2015 decision. (D.N. 77-1, PageID # 498) The parties responded to each other's respective motions (D.N. 78; D.N. 79), and they both filed replies (D.N. 80; D.N. 81).

## II.

A court may grant summary judgment only if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A material fact is one that "might affect the outcome of the suit under the governing law," and a dispute about such a fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the

---

[6] Deckard is not among the defendants who are presently moving for summary judgment. (*See* D.N. 76-1) Unlike the other defendants, she did not waive service of a summons. (*See* D.N. 12) And the record does not indicate that she was subsequently served with the requisite process or that she filed an answer to Staub's complaint. Accordingly, the Court will order Staub to show cause why Deckard should not be dismissed from this action. *See* Fed. R. Civ. P. 4(m); Fed. R. Civ. P. 21. Additionally, on December 16, 2021, the defendants "g[a]ve notice of the death of Marcus Faulkner." (D.N. 82) Because the Court is granting summary judgment in Faulkner's favor on all of Staub's claims against him, however, it does not need to address the procedure for substituting a "proper party" for a deceased defendant. *See* Fed. R. Civ. P. 25(a).

nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  The "ultimate question" at the summary-judgment stage is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Back v. Nestle USA, Inc.*, 694 F.3d 571, 575 (6th Cir. 2012) (quoting *Anderson*, 477 U.S. at 251–52).

The moving party bears the initial burden of "showing the absence of a genuine issue of material fact." *Laster v. City of Kalamazoo*, 746 F.3d 714, 726 (6th Cir. 2014).  Once this burden is met, the nonmovant "must—by deposition, answers to interrogatories, affidavits, and admissions on file—show specific facts that reveal a genuine issue for trial." *Id.*  If the nonmovant "fails to properly support an assertion of fact or fails to properly address another party's assertion of fact," that fact may be treated as undisputed.  Fed. R. Civ. P. 56(e)(2).  Moreover, summary judgment must be entered against a party "who fails to make a showing sufficient to establish the existence of an element essential to [its] case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

A court must view the evidence in the light most favorable to the nonmoving party.  *Loyd v. Saint Joseph Mercy Oakland*, 766 F.3d 580, 588 (6th Cir. 2014).  And where, as here, a court is presented with cross-motions for summary judgment, it "must evaluate each party's motion on its own merits, taking care in each instance to draw all reasonable inferences against the party whose motion is under consideration." *McKay v. Federspiel*, 823 F.3d 862, 866 (6th Cir. 2016) (quoting *Taft Broad. Co. v. United States*, 929 F.2d 240, 248 (6th Cir. 1991)).

### III.

The Court will address Staub's motion for partial summary judgment first.  (*See* D.N. 77) He moves for summary judgment on the issue of whether Nietzel, Faulkner, Beasley, Wilson, and

Taylor violated his federal due process rights during the investigations and disciplinary hearings that followed the December 19, 2012 search of his living quarters at NTC.[7]  (*See* D.N. 77-1, PageID # 498, 514–18, 521)   More specifically, he contends that the Kentucky Court of Appeals "already . . . decided" in its May 2015 *Staub* decision that "the defendants violated [Staub's] due process rights" when they "impos[ed] punitive sanctions on [him] without validly producing 'some evidence' as required by relevant U.S. Supreme Court standards."  (*Id.*, PageID # 509)   And because of this prior state-court decision, Staub argues that the defendants are barred by the doctrine of issue preclusion from relitigating the key "factual events" in this case as well as whether those events "constitute[d] a violation of Due Process."  (*Id.*, PageID # 517; *see id.*, PageID # 498)   Staub appears to assert, in essence, that *Staub*'s preclusive effect entitles him to summary judgment at least as to his four due process claims against Nietzel, Faulkner, Beasley, Wilson, and Taylor. (*See id.*, PageID # 509, 515–18; D.N. 1, PageID # 11–12)

The defendants counter that the *Staub* decision does not have preclusive effect here because "no Defendant in" the present case "had a 'full and fair opportunity to litigate' any allegation" made in that earlier action.  (D.N. 78, PageID # 546)   They point out that Nietzel, Faulkner, Beasley, and Wilson were not parties to Staub's state-court case and that Taylor, although named as a defendant in the *Staub* litigation, was previously sued in his official capacity but is presently being sued in his individual capacity.  (*Id.*, PageID # 544–45)   The defendants also claim that "even if [they] had been parties to Staub's Petition for Declaration of Rights action" in state court,

---

[7] In his motion, Staub argues that "*the defendants* violated [his] due process rights," which presumably includes Deckard.  (D.N. 77-1, PageID # 509 (emphasis added))  Because the record does not indicate that Deckard was ever served with process, however, the Court cannot address Staub's claims against her.  *See King v. Taylor*, 694 F.3d 650, 655 (6th Cir. 2012) ("[W]ithout proper service of process, consent, waiver, or forfeiture, a court may not exercise personal jurisdiction over a named defendant.").

none of them "would . . . have been afforded an opportunity to defend themselves" given the unique procedures and standard of review that apply under Kentucky law in a declaration-of-rights case involving a prison disciplinary action. (*Id.*, PageID # 545–46)

## A.

The doctrine of issue preclusion generally "precludes relitigation of issues of fact or law actually litigated and decided in a prior action between the same parties and necessary to the judgment, even if decided as part of a different claim or cause of action." *Ga.-Pac. Consumer Prods. LP v. Four-U-Packaging, Inc.*, 701 F.3d 1093, 1098 (6th Cir. 2012) (quoting *Gargallo v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 918 F.2d 658, 661 (6th Cir. 1990)). Federal law requires federal courts "to give the same preclusive effect to state court judgments that those judgments would be given in the courts of the State from which the judgments emerged." *Kremer v. Chem. Constr. Corp.*, 456 U.S. 461, 466 (1982) (citing 28 U.S.C. § 1738); *see Roskam Baking Co. v. Lanham Mach. Co.*, 288 F.3d 895, 904 (6th Cir. 2002). And this preclusion rule applies with equal force to § 1983 actions, meaning a federal court can be barred "from freshly deciding constitutional claims previously litigated in state courts." *Kremer*, 456 U.S. at 476. Accordingly, to determine whether the Kentucky Court of Appeals' *Staub* decision precludes the defendants from litigating Staub's due process claims against them in this federal suit, the Court must look to Kentucky's law of issue preclusion. *See, e.g.*, *George v. Hargett*, 879 F.3d 711, 718 (6th Cir. 2018) ("The preclusive effect of the state court's decision in this federal litigation is governed by [that state's] law.").

Under Kentucky law, issue preclusion "operate[s] as a bar to further litigation" only if the following elements are met: (1) "the party to be bound in the second case must have been a party in the first case"; (2) "the issue in the second case must be the same as the issue in the first case";

(3) "the issue must have been actually litigated"; (4) "the issue was actually decided in that action"; and (5) "the decision on the issue in the prior action must have been necessary to the court's judgment and adverse to the party to be bound." *Ky. Bar Ass'n v. Greene*, 386 S.W.3d 717, 724 (Ky. 2012). If applicable, issue preclusion can bar relitigation of any previously decided "question of law or fact." *Revenue Cabinet v. Samani*, 757 S.W.2d 199, 201 (Ky. Ct. App. 1988). A person who was not a party in an earlier case can assert issue preclusion against any "losing litigant" from that case, provided the doctrine's other elements are satisfied. *Moore v. Commonwealth*, 954 S.W.2d 317, 319 (Ky. 1997). But a party can be estopped from relitigating an issue only if it "had a realistically full and fair opportunity to present [its] case" in a prior action. *Id.* (quoting *Sedley v. City of West Buechel*, 461 S.W.2d 556, 559 (Ky. 1970)); *see Estate of Reeder v. Ashland Police Dep't*, 588 S.W.3d 160, 166 (Ky. Ct. App. 2019) (noting that "the estopped party" must have been "given a full and fair opportunity to litigate").

## B.

Applying Kentucky's law of issue preclusion here, the Court concludes that Nietzel, Faulkner, Beasley, Wilson, and Taylor are not bound by the Kentucky Court of Appeals' decision in *Staub*, which in turn means that they are not precluded from litigating Staub's due process claims against them in the present case.

To start, issue preclusion applies only when "the issue in the second case" is "the same as the issue in the first case," and only then if that issue "was actually decided" in the earlier action. *Ky. Bar Ass'n*, 386 S.W.3d at 724; *see Yeoman v. Commonwealth, Health Policy Bd.*, 983 S.W.2d 459, 465 (Ky. 1998) ("The issues in the former and latter actions must be identical."). In *Staub*, the Kentucky Court of Appeals concluded that Staub's due process rights were violated when he was found guilty by Deckard and Taylor of possessing dangerous contraband without there being

"'some evidence' in the record to support th[at] finding." *See Staub*, 2015 WL 2445103, at \*5. Yet the *Staub* court said nothing about whether (1) Faulkner's preparation of a second disciplinary report, (2) Nietzel's preparation of a suspect chain-of-custody form, or (3) Taylor's ratification of Deckard's decision to preside over Staub's second disciplinary hearing independently deprived Staub of due process. (*See* D.N. 1, PageID # 11–12)  The defendants therefore cannot be barred in this case from litigating these distinct issues, which the Kentucky Court of Appeals left unaddressed. *See Yeoman*, 983 S.W.2d at 466 (concluding that "minor differences" between an issue in an earlier case and an issue in a subsequent one "are sufficient to avoid issue preclusion").

More fundamentally, Nietzel, Faulkner, Beasley, and Wilson were not parties to the *Staub* litigation. (*See* D.N. 77-1, PageID # 516 (conceding that only Taylor and Deckard were "named in the state court case"))  Consequently, none of these defendants had a "full and fair opportunity to present his [or her] case" in state court. *Moore*, 954 S.W. 2d at 319.  And that alone is sufficient under both state and federal law to prevent them from being bound to any extent by the Kentucky Court of Appeals' decision. *See Ky. Bar Ass'n*, 386 S.W.3d at 724 (requiring that "the party to be bound in the second case must have been a party in the first case"); *see also Smith v. Bayer Corp.*, 564 U.S. 299, 312 (2011) (observing that a "basic premise of preclusion law" is that "[a] court's judgment binds only the parties to a suit"); *Richards v. Jefferson Cty.*, 517 U.S. 793, 797 n.4 (asserting that a state "cannot, without disregarding the requirement of due process, give a conclusive effect to a prior judgment against one who is neither a party nor in privity with a party therein"); *Roskam Baking Co.*, 288 F.3d at 904 ("For issue preclusion to apply in federal court . . . the issue must have been fully and fairly litigated in the state court.").

Taylor, in contrast, was named as a defendant in Staub's state-court case. *See Staub*, 2015 WL 2445103, at \*3.  Moreover, Staub alleges in the present case that Taylor violated his due

16

process rights when Taylor affirmed Staub's disciplinary conviction for possessing dangerous contraband "absent an adequate foundation for admitting test results" (D.N. 1, PageID # 11–12), which implicates the precise issue that was decided by the Kentucky Court of Appeals in *Staub*. *See* 2015 WL 244103, at \*5. Yet Staub concedes that he previously sued Taylor "in his capacity as Warden." (D.N. 77-1, PageID # 516) And the nature of a petition for declaration of rights in state court strongly suggests that Taylor was indeed sued in his official capacity as a state prison official, meaning that Staub's suit was "in all respects other than name . . . a suit against" KDOC, the "entity of which [Taylor] [wa]s an agent." *Lassiter v. Am. Express Travel Related Servs. Co.*, 308 S.W.3d 714, 719 (Ky. 2010) (quoting *Kentucky v. Graham*, 473 U.S. 159, 165 (1985); *see Smith v. O'Dea*, 939 S.W.2d 353, 355 (Ky. Ct. App. 1997) (per curiam) (describing a "petition for declaratory judgment" as "the vehicle . . . whereby inmates may seek review of their disputes *with the Corrections Department*" (emphasis added)); *id.* (noting that such petitions require a state court "to ensure that the *agency's* judgment comports with the legal restrictions applicable to it" (emphasis added)). Because Staub's state-court suit against Taylor in his official capacity was thus the "functional equivalent" of a suit against KDOC, *see Lassiter*, 308 S.W. 3d at 719, "the party to be bound" in the present case—Taylor in his individual capacity (*see* D.N. 1, PageID # 2)—was not a "party in the first case." *See Ky. Bar Ass'n*, 386 S.W.3d at 724. And because that requisite element of issue preclusion is not satisfied here, *see id.*, Taylor cannot be barred by the *Staub* decision from litigating the due process claims asserted against him in the present case.

The Court finds further support for this conclusion in the Restatement (Second) of Judgments, which provides that "[a] party appearing in an action in one capacity, individual or representative, is not thereby bound by . . . the rules of res judicata in a subsequent action in which he appears in another capacity." Restatement (Second) of Judgments § 36(2) (Am. Law Inst.

1982); *see id.* cmt. a ("With respect to issue preclusion, a party . . . is not precluded where the capacities in which he participated [in successive actions] are different."). Kentucky courts have regularly "turned to the Restatement when analyzing" issue preclusion, *Appalachian Reg'l Healthcare, Inc. v. U.S. Nursing Corp.*, 824 F. App'x 360, 369–70 (6th Cir. 2020), and Staub does not cite any authority explaining why this different-capacities rule should not apply to Taylor here.

In sum, because the present case involves (1) issues that were not decided by the Kentucky Court of Appeals in *Staub* and (2) defendants who were not parties to that earlier action, *Staub* would not have preclusive effect against Nietzel, Faulkner, Beasley, Wilson, and Taylor under Kentucky law. *See Ky. Bar Ass'n*, 386 S.W.3d at 724 (listing the elements of issue preclusion under state law). And by operation of federal statute, *Staub* likewise has no preclusive effect against these defendants in this case. *See Kremer*, 456 U.S. at 466 (citing 28 U.S.C. § 1738). Staub is thus not entitled to judgment as a matter of law on the issue of the defendants' liability for violating his right to due process (*see* D.N. 77-1, PageID # 498, 515–18), *see* Fed. R. Civ. P. 56(a), and his motion for partial summary judgment will be denied.[8]

## IV.

The Court will now address the defendants' motion for summary judgment. (*See* D.N. 76) Nietzel, Faulkner, Beasley, Wilson, Taylor, Thompson, and Brown move for summary judgment

---

[8] Staub addresses several other issues in his summary-judgment motion, including whether the defendants are entitled to qualified immunity and whether he has adequately pleaded damages and his state-law claims. (*See* D.N. 77-1, PageID # 510–15, 518–21) These arguments, however, are more relevant as a response to the defendants' motion for summary judgment than as support for Staub's. *See Laster v. City of Kalamazoo*, 746 F.3d 714, 726 (6th Cir. 2014) (noting that the moving party has the initial burden of showing why he or she is entitled to summary judgment). The Court will therefore consider Staub's additional arguments when considering the defendants' motion in the next section.

as to "each of Staub's claims against them."[9]   (D.N. 76-1, PageID # 414)   The Court will accordingly proceed claim by claim.

## A.

The defendants first argue that they are entitled to summary judgment on all four of Staub's due process claims against Nietzel, Faulkner, Beasley, Wilson, and Taylor (*see* D.N. 1, PageID # 11–12), both because each of these defendants is entitled to qualified immunity and because all four claims fail as a matter of law.  (*See* D.N. 76-1, PageID # 395–405)  Staub contends in response that the defendants are not entitled to qualified immunity because they violated his clearly established due process rights.  (*See* D.N 79, PageID # 591–96)  And he argues that the "various versions" of the facts that have been offered by the defendants over the course of this litigation "only serve to demonstrate decisively that . . . genuine issues of material fact" still exist.  (*Id.*, PageID # 585)

A plaintiff bringing a § 1983 claim must establish (1) "that he was denied a constitutional right," and (2) "that the deprivation was caused by a defendant acting under color of state law." *Carl v. Muskegon Cty.*, 763 F.3d 592, 595 (6th Cir. 2014).  Here, Staub claims that while serving as state prison officials, Nietzel, Faulkner, Beasley, Wilson, and Taylor each committed acts during Staub's 2013 prison disciplinary proceedings that denied him his Fourteenth Amendment right to due process of law.  (*See* D.N. 1, PageID # 2, 11–12)  The defendants do not dispute that they acted "under color of state law" when they searched, investigated, and ultimately disciplined

---

[9] Recognizing the extensive factual background and procedural history of this case, as well as the fact that seven defendants are moving for summary judgment on multiple claims, the Court will grant the defendants' motion to exceed the page limit for motions set by Local Rule 7.1(d). (D.N. 76)

Staub while he was an inmate at NTC and KSR, but they do argue that Staub was never "denied [his] constitutional rights," *Carl*, 763 F.3d at 595.  (*See* D.N. 76-1, PageID # 400–05)

Under the Fourteenth Amendment, prisoners "cannot be 'deprived of life, liberty, or property'" by state prison officials "without due process of law." *Bethel v. Jenkins*, 988 F.3d 931, 942 (6th Cir. 2021) (quoting *Wolff v. McDonnell*, 418 U.S. 539, 556 (1974)).  To "invoke" the Due Process Clause's "procedural protection," an inmate must first show that a protected liberty interest "is at stake." *Wilkinson v. Austin*, 545 U.S. 209, 221 (2005).  It is well established that inmates have a protected liberty interest in good-time credits "created by state laws or policies." *Id.*; *see Wolff*, 418 U.S. at 558 (recognizing that "the minimum requirements of procedural due process . . . must be observed" before an inmate can lose good-time credits to which he is entitled under state law).  The parties here do not dispute that Staub's disciplinary conviction for possessing dangerous contraband caused him to lose 180 days of good-time credit.  (*See* D.N. 76-1, PageID # 391; D.N. 79, PageID # 582–83)  And because they likewise do not dispute that Staub was thus "deprived of" a protected liberty interest, his procedural-due-process claims hinge on whether the defendants "afford[ed] him adequate procedural rights prior to depriving him of" that interest.  *See O'Neill v. Louisville/Jefferson Cty. Metro Gov't*, 662 F.3d 723, 732 (6th Cir. 2011) (articulating the elements of a procedural-due-process claim); *see also Hill*, 472 U.S. at 453–54 (proceeding to examine "the nature of the constitutionally required procedures" after assuming that inmates had been deprived of a protected liberty interest).

The Supreme Court has made clear that when a prison disciplinary hearing may result in the revocation of good-time credits, due process requires that an inmate "receive: (1) advance written notice of the disciplinary charges; (2) an opportunity, when consistent with institutional safety and correctional goals, to call witnesses and present documentary evidence in his defense;

20

and (3) a written statement by the factfinder of the evidence relied on and the reasons for the disciplinary action." *Hill*, 472 U.S. at 454 (citing *Wolff*, 418 U.S. at 563–67). A finding of guilt by prison officials must also be "supported by some evidence in the record"—that is, such a finding comports with due process if "there is any evidence in the record that could support the [prison official's] conclusion." *Id.* at 454–56.

In light of these standards, the defendants are entitled to summary judgment on all four of the due process claims asserted by Staub in Count I of his complaint, as explained below. (*See* D.N. 1, PageID # 11–12) Three of those claims concern actions by prison officials that do not amount to constitutional violations as a matter of law. And as explained below, even if the Court assumes for purposes of the remaining claim that Staub's due process rights were violated, the defendants are nonetheless shielded by qualified immunity.

**1.      Faulkner's Second Disciplinary Report**

Staub first claims that his due process rights were violated when, after it was ordered that his first disciplinary conviction for possessing dangerous contraband be reheard, Faulkner "issued a new disciplinary report" in February 2013 "in contravention of" KDOC procedures. (D.N. 1, PageID # 11; *see* D.N. 76-1, PageID # 390; D.N. 76-13) Even assuming, however, that Faulkner's decision to prepare a second disciplinary report violated internal prison procedures, that violation did not, as a matter of law, deprive Staub of his federal due process rights.

"[S]tate law does not ordinarily define the parameters of due process for Fourteenth Amendment purposes." *Smith v. City of Salem*, 378 F.3d 566, 578 (6th Cir. 2004). Consequently, "[t]here is no constitutional violation when state actors fail to meet their own regulations," so long as the minimum due process requirements established by federal law "have been met." *Black v. Parke*, 4 F.3d 442, 448 (6th Cir. 1993). Here, that Faulkner prepared a second disciplinary report

says nothing about whether Staub was afforded the procedural protections required by *Wolff* and *Hill* during his second disciplinary hearing at KSR.  And Faulkner's "failure to adhere to" KDOC's "own policies or guidelines" does not, standing alone, amount to a federal due process violation. *See Brookshire v. Butler*, No. 6:15-cv-60, 2015 WL 4875412, at *4 (E.D. Ky. Aug. 13, 2015); *see also Higgs v. Easterling*, No. 3:11-cv-499, 2012 WL 692610, at *6 (W.D. Ky. Mar. 2, 2012) ("[T]he failure of prison officials to follow institutional procedures or policies does not give rise to a constitutional claim.").  Faulkner's preparation of a second disciplinary report therefore did not violate Staub's constitutional rights, entitling Faulkner to summary judgment on Staub's first due process claim.  *See* Fed. R. Civ. P. 56(a).

**2.      Nietzel's Chain-of-Custody Form**

Staub next claims that Nietzel, Faulkner, Beasley, Wilson, and Taylor violated his due process rights when they "acted in concert to create and pass" an allegedly "forged and falsified" chain-of-custody form to "ensure a disciplinary conviction" against him.  (D.N. 1, PageID # 11; *see* D.N. 77-1, PageID # 517; D.N. 79, PageID # 587)

As an initial matter, Staub does not point to anything in the record that counters Faulkner's and Beasley's assertions that they had nothing to do with the chain-of-custody form at issue in this case after they each made their respective entries on that form on December 19, 2012 (*see* D.N. 76-2, PageID # 419–20; D.N. 76-6, PageID # 436), let alone anything even remotely suggesting that the two "acted in concert" with Nietzel to prepare a forged form.  *See Laster,* 746 F.3d at 726 (noting that the party opposing summary judgment must "*show specific facts* that reveal a genuine issue for trial" (emphasis added)).  Nor does Staub cite any evidence indicating that Wilson or Taylor played a role in Nietzel's completion and handling of the disputed chain-of-custody form, let alone that the two helped or encouraged Nietzel to forge it.  (*See* D.N. 76-16; D.N. 76-17,

PageID # 484–85)  In short, Staub's claim that Faulkner, Beasley, Wilson, and Taylor worked with Nietzel to "create and pass" a forged chain-of-custody form is based on nothing but "[c]onclusory statements unadorned with supporting facts," which are "insufficient to establish a factual dispute that will defeat summary judgment." *Viet v. Le*, 951 F.3d 818, 823 (6th Cir. 2020) (quoting *Alexander v. CareSource*, 576 F.3d 551, 560 (6th Cir. 2009)).

Moreover, even assuming that Staub has raised a genuine factual dispute as to whether Nietzel forged a chain-of-custody form (*see* D.N. 77-1, PageID # 502, 517), her mere creation of a forged document would not amount to a standalone procedural-due-process violation.  First, regardless of the chain-of-custody form's authenticity, Nietzel was not involved in deciding Staub's guilt during either of the disciplinary hearings that resulted in him losing good-time credit. (*See* D.N. 76-3, PageID # 424–25; D.N. 76-5, PageID # 432; D.N. 76-13, PageID # 467; D.N. 77-1, PageID # 500–02).  As a result, it cannot be said that she "caused" the unconstitutional deprivation of that protected liberty interest.  *See Carl*, 763 F.3d at 595; *see also Alexander v. Alexander*, 706 F.2d 751, 754–55 (6th Cir. 1983) (affirming the dismissal of a § 1983 claim because the defendants "were in no way involved in the decision" that resulted in the alleged constitutional violation).

Second, as an inmate, Staub had "no constitutional right to be free from false accusations of misconduct." *Jackson v. Hamlin*, 61 F. App'x 131, 132 (6th Cir. 2003) (citing *Freeman v. Rideout*, 808 F.2d 949, 951 (2d Cir. 1986)).  Indeed, the mere issuance of a false prison disciplinary report or the mere filing of fabricated charges against an inmate "do[es] not constitute a deprivation of constitutional rights where the charges are subsequently adjudicated in a fair hearing." *Cromer v. Dominguez*, 103 F. App'x 570, 573 (6th Cir. 2004); *see id.* ("Because [an inmate] was provided a due process hearing for [a] misconduct charge, his constitutional rights were not violated[,] and

he may not maintain a § 1983 claim for [an] alleged false misconduct report."). Thus, because Staub was afforded such a hearing, during which an adjustment officer independently assessed the authenticity and adequacy of the evidence against him (*see* D.N. 76-13, PageID # 467), Nietzel's alleged forgery could not have "give[n] rise" on its own "to a *per se* constitutional violation actionable under [§] 1983." *Freeman*, 808 F.2d at 953. The defendants are thus also entitled to summary judgment on Staub's second due process claim. *See* Fed. R. Civ. P. 56(a).

### 3.     Defendants' Reliance on Nietzel's Chain-of-Custody Form to Find Staub Guilty

Staub's third due process claim alleges that Wilson and Taylor violated Staub's due process rights "when they charged and convicted [Staub]" of possessing dangerous contraband "absent an adequate foundation for admitting test results, in contravention of clearly established law." (D.N. 1, PageID # 11–12)

Even under Staub's version of the facts, Wilson merely investigated Staub's second disciplinary report and thus did not participate in Staub's second hearing at KSR, evaluate the evidence presented during that hearing, or "convict[]" Staub of anything. (*See* D.N. 1, PageID # 7–9; D.N. 77-1, PageID # 501–02) Wilson therefore cannot be held liable for allegedly unconstitutional conduct—here, convicting Staub of an offense without sufficient evidence—in which he did not partake. *See Carl*, 763 F.3d at 595 (requiring that a plaintiff bringing a § 1983 claim establish that a particular defendant "caused" the alleged constitutional violation).

As for Taylor, the Kentucky Court of Appeals previously concluded that his reliance on Nietzel's "highly suspect" chain-of-custody form to affirm Staub's disciplinary conviction for possessing dangerous contraband violated Staub's due process rights. *Staub*, 2015 WL 2445103, at *5–6. More specifically, the *Staub* court held that Taylor's reliance on this suspect evidence, combined with the fact that "there [wa]s no other evidence in the record to support" Staub's

24

disciplinary conviction, violated the federal due process requirement established in *Hill* that prison disciplinary convictions be based on "some evidence" in the record. *Id.* at *1, 5–6. As explained above, the Court is not bound by the state court's legal conclusion. But it need not revisit the question of whether Taylor violated the "some evidence" standard because, even if he did, Taylor would be entitled to qualified immunity.

The defense of qualified immunity "protects government officials performing discretionary functions unless their conduct violates a clearly established statutory or constitutional right of which a reasonable person in the official's position would have known." *Brown v. Lewis*, 779 F.3d 401, 411 (6th Cir. 2015) (quoting *Silberstein v. City of Dayton*, 440 F.3d 306, 311 (6th Cir. 2006)); *Turney v. Scroggy*, 831 F.2d 135, 138 (6th Cir. 1987) (underscoring that qualified immunity protects prison wardens acting in an "adjudicatory capacity"). A plaintiff seeking to overcome qualified immunity must show (1) that "a constitutional violation has occurred" and (2) that the "violation involved a clearly established constitutional right of which a reasonable person would have known." *Brown*, 779 F.3d at 411 (quoting *Sample v. Bailey*, 409 F.3d 689, 695–96 (6th Cir. 2005)); *see Silberstein*, 440 F.3d at 311 ("[T]he burden is on the plaintiff to demonstrate that . . . officials are not entitled to qualified immunity."). Assuming without deciding that the Kentucky Court of Appeals was correct in holding that Taylor violated the "some evidence" standard—and thus, by extension, Staub's due process rights—whether Taylor is entitled to qualified immunity therefore depends on whether the constitutional right he violated was "clearly established." *See Brown*, 779 F.3d at 411.

A constitutional right is clearly established for purposes of qualified immunity if "it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Silberstein*, 440 F.3d at 311 (quoting *Saucier v. Katz*, 533 U.S. 194, 201 (2001)). Put another way,

the "contours of the right" as determined by pre-existing case law "must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Brown*, 779 F.3d at 412 (quoting *Saucier*, 533 U.S. at 202). "Only when 'existing precedent' places the rule at issue 'beyond debate'" will the law be considered "'clearly established.'" *Kesterson v. Kent State Univ.*, 967 F.3d 519, 524 (6th Cir. 2020) (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011)).

In both his response and his summary-judgment motion, Staub maintains that Taylor violated a clearly established right because the particular right that Taylor contravened—the "some evidence" standard of proof that applies in prison disciplinary hearings—"has been firmly established now at least since" 1985, when the Supreme Court decided *Hill*. (D.N. 77-1, PageID # 513; *see* D.N. 79, PageID # 595) This misunderstands the relevant inquiry, however. Whether a constitutional right is clearly established does not depend on the pedigree of the right being invoked but rather "on the specific facts of the case and their similarity to caselaw in existence at the time of the alleged violation." *Gordon v. Bierenga*, 20 F.4th 1077, 1082 (6th Cir. 2021). Consequently, the question here is not whether it was clearly established that, in affirming Staub's conviction for possessing dangerous contraband, Taylor was obligated to adhere to the "some evidence" standard established in *Hill*; Taylor does not dispute that KSR officials must follow *Hill* during disciplinary hearings. (*See* D.N. 76-17, PageID # 482–84) Instead, the proper inquiry is whether it was clearly established that Taylor would violate the "some evidence" standard by finding Staub guilty of possessing contraband based in part on an imperfect or suspect chain-of-custody form that was meant to establish that the Suboxone strips seized from Staub were the same ones that later tested positive for buprenorphine.

Given the "specific facts" of the present case "and their similarity to [existing] caselaw," *Gordon*, 20 F.4th at 1082, Staub has failed to show that Taylor's reliance on Nietzel's suspect

chain-of-custody form violated a clearly established right.  *See Silberstein*, 440 F.3d at 311 (noting

that the plaintiff bears the burden of overcoming a qualified-immunity defense).  Contrary to what

Staub suggests in his response (*see* D.N. 79, PageID # 593–95), the *Hill* Court did not define the

precise contours of the "some evidence" standard.  Indeed, the Court only concluded that

Massachusetts prison officials did not violate the newly minted "some evidence" standard when

they found two prisoners guilty of assaulting another inmate based solely on the testimony of a

prison guard who saw the prisoners "jogging away" from the scene of the assault but not the attack

itself.  *See Hill*, 472 U.S. at 447–48, 456; *id.* at 457 (concluding that while the evidence against

the prisoners in *Hill* "might be characterized as meager," the finding of guilt was not "so lacking

in evidentiary support as to violate due process").  Thus, it simply cannot be said that the fact

pattern in *Hill* would have put Taylor on notice that his reliance on an imperfect chain-of-custody

form to find Staub guilty of possessing contraband would clearly violate the "some evidence"

standard—a standard which, it should be noted, the *Hill* Court characterized as especially lenient.

*See id.* at 457 (noting that a finding of guilt in a prison disciplinary hearing would violate due

process only if "the record is . . . so devoid of evidence that the findings of the disciplinary board

[are] without support or otherwise arbitrary"); *see also Kesterson*, 967 F.3d at 524 (emphasizing

that a "key consideration" in the clearly-established-law inquiry is whether a "reasonable officer"

would have notice that certain "challenged actions violate the law").

        In fact, Sixth Circuit case law suggests that Taylor's affirmance of Staub's guilt based on

Nietzel's suspect chain-of-custody form, combined with the additional evidence available to him,

clearly *did not* violate the "some evidence" standard.  In *Higgs v. Bland*, 888 F.2d 443 (6th Cir.

1989), for instance, the Sixth Circuit had "little difficulty" concluding that a urine sample that

tested positive for an illegal substance could, on its own, "constitute[] 'some evidence' from

which" a prison disciplinary board "could conclude that a tested inmate was guilty of the offense of drug use."  888 F.2d at 449; *see Brookshire v. Butler*, No. 6:15-cv-60, 2015 WL 4875412, at *3 (E.D. Ky. Aug. 13, 2015) (noting that in the prison discipline context, "[a] positive drug test is 'some evidence' that the tested substance was an illegal narcotic.").  And because "the Due Process Clause has never been construed to require that the procedures used to guard against an erroneous deprivation of a protectible 'property' or 'liberty' interest be so comprehensive as to preclude any possibility of error," the *Higgs* court added that a positive drug-test result can satisfy the "some evidence" standard even if an inmate "introduce[s] evidence that indicate[s] some lapses in the chain-of-custody."  *Higgs*, 888 F.2d at 449 (quoting *Mackey v. Montrym*, 443 U.S. 1, 13 (1979)); *see Baker v. Kassulke*, 959 F.2d 233, *1 (6th Cir. 1992) (unpublished) (asserting that state prisoners are "not constitutionally entitled to an 'air-tight' chain of custody" under the Due Process Clause).  A reasonable warden in Taylor's position thus could have interpreted *Higgs* as suggesting that, because the positive buprenorphine test provided by Nietzel (*see* D.N. 76-15) alone constituted "some evidence" of Staub having possessed contraband, affirming Staub's conviction for that offense would comport with due process despite the purported "lapses" in Nietzel's chain-of-custody process.  *See Higgs*, 888 F.2d at 449; *see also Hegar v. Lucas*, No. 19-12084, 2021 WL 1774444, at *1, *8 (concluding that showing "suboptimal chain-of-custody procedures," including leaving urine tests uncovered and unattended and unsealing urine samples to replace incorrect labels, did not equate to a showing that a prison disciplinary conviction "was not based on at least 'some evidence'").

Taylor's reliance on Nietzel's field-test results and her suspect chain-of-custody form to affirm Staub's disciplinary conviction (*see* D.N. 76-13, PageID # 468) was therefore arguably compatible with, rather than clearly violative of, established law.  As a result, Staub has failed to

show that Taylor violated a clearly established right, and the defendants are entitled to summary judgment as to Staub's third due process claim on qualified-immunity grounds.  *See Brown*, 779 F.3d at 412.

### 4.    Taylor's Ratification of Deckard Serving as Adjustment Officer

In his final due process claim, Staub asserts that his right "to be judged by an impartial decision-maker" was violated when Deckard "sat as adjustment officer and convicted [Staub]" during his second disciplinary hearing in March 2013 despite having also "participat[ed] in the investigative process," a purportedly unconstitutional arrangement that was ultimately "ratified" by Taylor.  (D.N. 1, PageID # 12)  Yet this claim likewise fails as a matter of law.

Since Staub claims that Deckard was the one who violated his due process rights (*see id.*), Taylor can be held liable for that constitutional violation only if, as Deckard's supervisor, he either "encouraged" the violation or "in some other way directly participated in it."  *Peatross v. City of Memphis*, 818 F.3d 233, 242 (6th Cir. 2016) (quoting *Shehee v. Luttrell*, 199 F.3d 295, 300 (6th Cir. 1999)).  That is, "at a minimum," Staub must show that Taylor "at least implicitly authorized, approved, or knowingly acquiesced in" Deckard's "unconstitutional conduct."  *Id.* (quoting *Shehee*, 199 F.3d at 300).

Here, however, Staub has failed to present evidence of an underlying due process violation that Taylor could have authorized, approved, or acquiesced in.  Staub's claim that Deckard violated his due process rights by serving as both an investigator and an adjustment officer appears to be based on the fact that such a dual role is prohibited by KDOC policy.  (*See* D.N. 76-1, PageID # 404; D.N. 76-10, PageID # 449)  But again, even if it can be said that Deckard genuinely "participat[ed] in the investigative process" in violation of KDOC policy simply by receiving documentary evidence from Nietzel and Wilson via email (D.N. 1, PageID # 12; *see* D.N. 76-15;

D.N. 76-16), "the failure of prison officials to follow institutional procedures or policies does not give rise to a constitutional claim." *Higgs*, 2012 WL 692610, at *6. And as a matter of federal due process, "the combination of investigative and adjudicative functions" in an administrative hearing does not inexorably "create[] an unconstitutional risk of bias." *Withrow v. Larkin*, 421 U.S. 35, 47, 58 (1975).

Staub is right, of course, that he was entitled under the Due Process Clause to have the disciplinary charges against him adjudicated by an impartial decision-maker. *See Wolff*, 418 U.S. 570–71. Yet he has failed to show *how* exactly Deckard's alleged participation in the investigative process rendered her impermissibly partial during the subsequent disciplinary hearing. *See Viet*, 951 F.3d at 823 ("Conclusory statements unadorned with supporting facts are insufficient to establish a factual dispute that will defeat summary judgment."). Indeed, Staub does not even allege in his complaint that Deckard was observably biased toward him during that hearing. (*See, e.g.*, D.N. 1, PageID # 9) And the Court finds no other basis for concluding that Deckard was not impartial. *See, e.g.*, *Antonelli v. Rios*, No. 06-283, 2009 WL 790171, at *8 (E.D. Ky. Mar. 24, 2009) (concluding that because a prison disciplinary hearing officer "was not in any way involved in the facts giving rise to the charge" against an inmate, "there [wa]s no basis to conclude that [the officer] was not impartial").

Because Staub has failed to show that Deckard was not an impartial decision-maker, there was no unconstitutional conduct for Taylor to ratify (*see* D.N. 1, PageID # 12). Accordingly, summary judgment is warranted in the defendants' favor as to Staub's fourth due process claim. *See Celotex Corp.*, 477 U.S. at 322 (requiring entry of summary judgment against a party "who fails to make a showing sufficient to establish the existence of an element essential to [its] case").

**B.**

In Count II of his complaint, Staub claims that he is entitled to damages under Kentucky's negligence-per-se statute, Ky. Rev. Stat. § 446.070, for the injuries he sustained as a result of various state crimes allegedly committed by Nietzel, Faulkner, Beasley, Wilson, and Taylor—specifically, forgery in the second degree and criminal complicity and criminal facilitation related to the alleged forgery   (*See* D.N. 1, PageID # 12)   In their summary-judgment motion, the defendants argue that they are entitled to judgment as a matter of law on the claims in Count II because Staub has not shown that any of the defendants actually violated a state criminal statute and thus has failed to establish an essential element of his negligence-per-se claims.  (D.N. 76-1, PageID # 405–06)   Staub does not directly respond to the defendants' argument, either in his response or in his own summary-judgment motion.  *See Brown v. VHS of Mich., Inc.*, 545 F. App'x 368, 372 (6th Cir. 2013) ("[A] plaintiff is deemed to have abandoned a claim when a plaintiff fails to address it in response to a motion for summary judgment.").

Regardless of whether Staub has abandoned his negligence-per-se claims, the defendants are entitled to summary judgment on those claims on the merits.  Ky. Rev. Stat. § 446.070 "codifie[s] the common law negligence per se doctrine and create[s] an avenue by which an individual may seek relief even where a statute does not specifically provide a private remedy." *Vanhook v. Somerset Health Facilities, LP*, 67 F. Supp. 3d 810, 817 (W.D. Ky. 2014).  This negligence-per-se statute can provide a civil cause of action for violations of Kentucky's criminal code by replacing the common-law standard of care with one defined by a criminal statute.  *See Readnour v. Gibson*, 452 S.W.3d 617, 621 (Ky. Ct. App. 2014) (deriving the applicable standard of care from "Kentucky's criminal assault provisions").  Accordingly, because Staub alleges that Nietzel violated Kentucky's forgery-in-the-second-degree statute by "forging and falsifying" a

31

chain-of-custody form (*see* D.N. 1, PageID # 12), the applicable standard of care here is derived from that statute, which provides in relevant part that "[a] person is guilty of [the offense] when, with intent to defraud, deceive or injure another, he falsely makes, completes or alters a written instrument . . . which is or purports to be . . . [a] written instrument officially issued or created by a public office, public employee or governmental agency." Ky. Rev. Stat. § 516.030(1)(c).

The defendants contend that Staub's negligence-per-se claims fail as a matter of law because "Staub has submitted no evidence indicating that any of the Defendants have been charged [with], much less convicted [of]" a criminal offense. (D.N. 76-1, PageID # 405)  When reviewing negligence-per-se claims based on purported violations of criminal statutes, Kentucky courts seemingly do not require proof of a criminal conviction to establish a breach of care. *See Readnour*, 452 S.W.3d at 621; *see also Ford v. Faller*, 439 S.W.3d 173, 177–82 (Ky. Ct. App. 2014) (reviewing case law and the defendant's conduct to determine whether a criminal statute had been violated for negligence-per-se purposes).  But as with all negligence claims, a plaintiff bringing a claim under Ky. Rev. Stat. § 446.070 must still establish that the statutorily defined standard of care was breached. *See id.* at 182 (affirming the trial court's grant of summary judgment on a negligence-per-se claim because the plaintiffs had failed to show that the defendant violated the applicable criminal statute).  And here, Staub has failed to provide evidence "sufficient to establish the existence of an element essential to [his] case," *see Celotex Corp.*, 477 U.S. at 322—namely, that Nietzel actually violated state law by forging a chain-of-custody form. *See* Ky. Rev. Stat. § 516.030.

The evidence that Staub has offered to support his allegation that Nietzel forged the chain-of-custody form at issue in this case appears to be (1) the fact that the chain-of-custody form reviewed during his first disciplinary hearing suggested that the suspected Suboxone strips seized

in his living quarters had never been tested for illegal substances, while the form reviewed during his second disciplinary hearing included an additional entry by Nietzel indicating that she had tested the strips for buprenorphine; (2) the fact that the Kentucky Court of Appeals concluded that these discrepancies rendered Nietzel's chain-of-custody form "highly suspect" for purposes of proving Staub guilty of possessing dangerous contraband[10]; and (3) the fact that Nietzel and Faulkner have apparently offered "evolving stor[ies]" over the course of this litigation regarding how exactly these discrepancies came about.  (*See* D.N. 77-1, PageID # 500–02, 504, 510; D.N. 79, PageID # 581–90)  This evidence is arguably consistent with forgery.  That is, given these facts, it is *conceivable* that the strips seized in Staub's living quarters at NTC were never tested for Suboxone—hence the absence of an entry on the initial chain-of-custody form indicating that the strips were removed from NTC's evidence locker for testing (*see* D.N. 76-5, PageID # 432; D.N. 76-8, PageID # 443)—and that Nietzel later added a fraudulent fourth entry on the chain-of-custody form for the insidious purpose of ensuring that Staub was convicted of a possession-of-contraband offense he did not commit.  (*See* D.N. 77-1, PageID # 517)

---

[10] Although the Court may take judicial notice of the factual findings made by the Kentucky Court of Appeals in its *Staub* decision for purposes of determining whether issue preclusion applies to the present case, *see United States v. Ferguson*, 681 F.3d 826, 834 (6th Cir. 2012) (observing that a court can judicially notice a judicial record when that record "record[s] some judicial action such as . . . finding a fact"), it is unlikely that the Court of Appeals' factual findings would be admissible for the purpose of proving that those facts are true.  *See* Fed. R. Evid. 802 (providing that, as a general matter, "[h]earsay is not admissible").  The Court accordingly recognizes that Staub cannot exclusively rely on language from the *Staub* opinion to show that a material fact is genuinely disputed in this case.  *See U.S. Structures, Inc. v. J.P. Structures, Inc.*, 130 F.3d 1185, 1189 (6th Cir. 1997) ("[E]vidence submitted in opposition to a motion for summary judgment must be admissible.").  As is relevant here then, the Kentucky Court of Appeals' conclusion that Nietzel's chain-of-custody form was "highly suspect" would not be admissible at trial to prove that the form was in fact forged or falsified.

Yet while Staub's evidence does not completely rule out the *possibility* that Nietzel forged a chain-of-custody form "with intent to defraud, deceive or injure" him, Ky. Rev. Stat. § 516.030, facts that suggest the "mere possibility of misconduct" are not even sufficient to state a claim for purposes of surviving a motion to dismiss. *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009); *see Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007) (affirming the dismissal of a complaint at the motion-to-dismiss stage because the plaintiffs had failed to "nudge[] their claims across the line from conceivable to plausible").  And such facts are similarly not sufficient to establish a genuine factual dispute for purposes of surviving summary judgment. *See Viet*, 951 F.3d at 823 ("Just as a plaintiff may not rely on conclusory allegations to proceed past the pleading stage, so too a plaintiff may not rely on conclusory evidence to proceed past the summary-judgment stage." (internal citations omitted)).  Indeed, Staub offers no concrete, admissible evidence indicating that Nietzel actually forged the chain-of-custody form at issue here.  (*See, e.g.*, D.N. 77-1, PageID # 509–10 (construing the Kentucky Court of Appeals' description of Nietzel's chain-of-custody form as "highly suspect" as evidence that the form was in fact the product of "tampering or forgery"))  Nor does he offer evidence or point to anything in the record that counters the defendants' explanation for the discrepancies between Nietzel's chain-of-custody form and the form reviewed during Staub's first disciplinary hearing—namely, that these discrepancies were the product of mere human error (*see, e.g.*, D.N. 76-1, PageID # 403, 413; D.N. 76-3, PageID # 424–26; D.N. 76-17, PageID # 485).  *See* Fed. R. Civ. P. 56(c)(1) (providing that "[a] party asserting that a fact . . . is genuinely disputed must support the assertion by" either "citing to particular parts of materials in the record" or "showing that the materials cited [by the opposing party] do not establish the absence . . . of a genuine dispute); *Celotex Corp.*, 477 U.S. at 323 (noting

that Rule 56 does not require a defendant moving for summary judgment to produce evidence "*negating* the opponent's claim").

In short, Staub's "unadorned, the-defendant-unlawfully-harmed-me accusation[s]" of outright forgery, *Iqbal*, 556 U.S. at 678, are not supported by "specific facts" in the record. *Laster* 746 F.3d at 726. And because he has thus failed to "reveal a genuine issue for trial" regarding an essential element of his negligence-per-se claim—specifically, that Nietzel actually forged a chain-of-custody form in violation of state law—the defendants are entitled to summary judgment on the claims in Count II of his complaint.[11]  *Id.*; *see Celotex Corp.*, 477 U.S. at 322–23.

## C.

The defendants likewise contend that they are entitled to summary judgment on Counts III and IV of Staub's complaint because the claims in each count are "couched . . . in conclusory and formulaic" language and are unsupported by evidence in the record.  (D.N. 76-1, PageID # 406; *see id.*, PageID # 407–08)  In Count III, Staub alleges that a concerted effort by Nietzel, Faulkner, Beasley, Wilson, and Taylor to "create and pass forged and falsified public records to ensure a disciplinary conviction" against Staub "constituted a civil conspiracy" under state law.  (D.N. 1, PageID # 13)  A civil-conspiracy claim in Kentucky requires a plaintiff to show "a corrupt or unlawful combination or agreement between two or more persons to do by concert of action an unlawful act, or to do a lawful act by unlawful means."  *Mosley v. Arch Specialty Ins. Co.*, 626 S.W.3d 579, 594 (Ky. 2021) (quoting *Peoples Bank of N. Ky., Inc. v. Crowe Chizek & Co.*, 277

---

[11] Staub also asserts negligence-per-se claims against Faulkner, Beasley, Wilson, and Taylor, in which he claims that these defendants "acted in concert" with Nietzel to "create/pass forged and falsified documents to ensure a disciplinary conviction" against Staub in violation of Kentucky's criminal complicity and criminal facilitation statutes.  (*See* D.N. 1, PageID # 12)  But since these offenses require the commission of an underlying crime, *see* Ky. Rev. Stat. § 502.020; *id.* § 506.080, the negligence-per-se claims against Faulkner, Beasley, Wilson, and Taylor rise and fall with the forgery-based negligence-per-se claim against Nietzel.

S.W.3d 255, 260–61 (Ky. Ct. App. 2008)).   As the Court explained in section III.A.2 above, however, the uncontradicted evidence in the record indicates that Faulkner, Beasley, Wilson, and Taylor played no role in Nietzel's handling and completion of the chain-of-custody form at issue here and thus could not have helped her "forge[] or falsif[y]" that document.   (*See* D.N. 76-2, PageID # 419–20; D.N. 76-6, PageID # 436; D.N. 76-16; D.N. 76-17, PageID # 484–85)   And even assuming that Nietzel did unlawfully forge the chain-of-custody form, the defendants are still entitled to judgment as a matter of law on Staub's civil-conspiracy claim because there cannot be a one-person conspiracy.  *See Mosley*, 626 S.W.3d at 594.

As for Count IV of Staub's complaint, he alleges that this same concerted effort by Nietzel, Faulkner, Beasley, Wilson, and Taylor to create and pass a forged public document "constitute[d] willful misconduct and gross negligence, justifying an award of punitive damages."   (D.N. 1, PageID # 13)   But the Court has already concluded for purposes of Staub's negligence-per-se claims that Staub has failed to establish a genuine factual dispute as to whether Nietzel actually forged a chain-of-custody form, and that breach element is equally essential to his gross negligence claims.  *See City of Middlesboro v. Brown*, 63 S.W.3d 179, 181 (Ky. 2001) (noting that a gross negligence claim requires "first a finding of failure to exercise reasonable care").   The defendants are thus likewise entitled to summary judgment on the claims in Count IV of Staub's complaint. *See Celotex Corp.*, 477 U.S. at 322–23; Fed. R. Civ. P. 56(a).

**D.**

Finally, Staub alleges in Count V of his complaint that Defendants LaDonna Thompson and J. Michael Brown—the Commissioner of KDOC and the Secretary of the Kentucky Justice and Public Safety Cabinet, respectively—negligently failed (1) "to promulgate administrative regulations to provide for the training" of state prison officials "with regard to disciplinary

procedures and prisoners' due process rights" and (2) "to provide for an appeal of disciplinary convictions beyond the warden," which foreseeably resulted in "systemic" violations of prisoners' due process rights, including the ones that Staub allegedly suffered during his own disciplinary hearings in 2013.  (D.N. 1, PageID # 2, 13)  The defendants argue that they are entitled to summary judgment as to these lone claims against Thompson and Brown, which are brought against the two defendants in both their official and individual capacities, because the claims are either moot or inadequately pleaded.  (D.N. 1, PageID # 2, 13; D.N. 76-1, PageID # 408–10)  The Court agrees.

Because Staub was released from prison several years ago (*see* D.N. 13; D.N. 76-18, PageID # 491), his official-capacity claims against Thompson and Brown for injunctive relief are moot.  *See Abdur-Rahman v. Mich. Dep't of Corr.*, 65 F.3d 489, 491 (6th Cir. 1995); *Shabazz v. Schofield*, No. 15-1149, 2020 WL 2776507, at *1 (W.D. Tenn. May 28, 2020) ("Due to his release [from prison], [the plaintiff's] official capacity claims for . . . injunctive relief under § 1983 are moot.").

As for Staub's individual-capacity claims, § 1983 only imposes liability "on a defendant who was personally involved in the unconstitutional action that caused the plaintiff's injury." *Pineda v. Hamilton Cty.*, 977 F.3d 483, 491 (6th Cir. 2020).  But Staub alleges that his due process rights were violated not by Thompson and Brown but rather by prison officials at NTC and KSR. (*See* D.N. 1, PageID # 11–12)  Staub ostensibly attempts to impute the prison officials' unconstitutional conduct to Thompson and Brown given that the two defendants directed the state agencies responsible for administering Kentucky's prisons.  (*See id.*, PageID # 2, 13)  Such supervisory liability, however, would "require[] some 'active unconstitutional behavior'" on Thompson's and Brown's parts.  *Peatross*, 818 F.3d at 241 (quoting *Bass v. Robinson*, 167 F.3d 1041, 1048 (6th Cir. 1999)); *see id.* ("[A] supervisor cannot be held liable simply because he or

she was charged with overseeing a subordinate who violated the constitutional rights of another.")

And here, Staub does not even allege—let alone show for purposes of surviving summary

judgment—that Thompson and Brown "encouraged" prison officials at NTC or KSR to deprive

Staub of his due process rights, "implicitly authorized" such constitutional violations, or

"approved" such violations after they occurred.  *See id.* at 241–42 (quoting *Sheehee*, 199 F.3d at

300) (stating that a supervisor's "mere failure to act will not suffice to establish supervisory

liability" and describing what a plaintiff must instead allege "at a minimum" to state a supervisory-

liability claim).

Indeed, even Staub's version of the facts indicates that Thompson and Brown had nothing

to do with Staub's prison disciplinary proceedings or his attendant loss of good-time credit.  (*See,

e.g.*, D.N. 79, PageID # 583 (noting that Taylor, as KSR's warden, was the highest-ranking prison

official to address Staub's disciplinary conviction); D.N. 1, PageID # 13 (acknowledging that

"appeal[s] of disciplinary convictions" do not proceed "beyond the warden")).  Consequently,

Staub has failed to establish a § 1983 supervisory-liability claim against Thompson and Brown as

a matter of law, entitling them to summary judgment on the claims in Count V of Staub's

complaint.

## V.

For the reasons set forth above, and the Court being otherwise sufficiently advised, it is

hereby

**ORDERED** as follows:

(1)    The motion by Defendants Nietzel, Faulkner, Beasley, Wilson, Taylor, Thompson,

and Brown for leave to exceed the page limit for motions set by Local Rule 7.1(d) (D.N. 76) is

**GRANTED**.

(2)     Staub's motion for partial summary judgment (D.N. 77) is **DENIED**.

(3)     The motion for summary judgment by Defendants Nietzel, Faulkner, Beasley, Wilson, Taylor, Thompson, and Brown (D.N. 76) is **GRANTED**.

(4)     Staub shall have **ten (10) days** from entry of this Order to **SHOW CAUSE** why Defendants "Bart Nyer" and Dawn Deckard (*see* D.N. 1, PageID # 2) should not be dismissed from this action.

March 11, 2022

**David J. Hale, Judge**
**United States District Court**